lml

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **DEREK SUNDERMAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Case No. 05-2347-JAR** |
| | ) | |
| **WESTAR ENERGY, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

## MEMORANDUM AND ORDER GRANTING
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Derek Sunderman filed suit against his former employer, Westar Energy, Inc.

("Westar") alleging that he was the victim of retaliation for engaging in protected activity under

Title VII of the Civil Rights Act of 1964, as amended.  This matter is before the Court on

Westar's Motion for Summary Judgment (Doc. 76).  For the reasons explained in detail below,

the Court grant's Westar's motion.

## I.      Uncontroverted Facts

Westar is a public utility company providing electric transmission, generation,

distribution, and marketing and agency services to retail and wholesale customers.  Plaintiff was

employed by Westar from February 28, 2000 until August 6, 2003.  Plaintiff was originally hired

by Doug Sterbenz as a Real Time Energy Trader.  This position is in the Bulk Power Marketing

Department, which is part of the Generation and Marketing Group.  During his employment with

Westar, plaintiff filled various positions within the Generation and Marketing Group.  In

February 2002, he was offered the position of "Manager, Origination" by John Olsen, which he

accepted.

Plaintiff was originally supervised by Sterbenz, who moved to the position of Executive Vice President of Generation and Marketing. Plaintiff later reported to Doug Gaumer, who left Westar in 2003, then John Olsen, who currently holds the position of Executive Director of Bulk Power Marketing.

### Manager, Origination Position

In late 2001, the Manager, Origination position in the Generation and Marketing Group was created due to a reorganization within the company, wherein the responsibilities as primary contact for wholesale municipals as well as certain retail customers were being moved away from the Customer Support Group. There were two manager-level positions created in the Generation and Marketing Group as a result. These positions differed as to the historic responsibilities of an originator because the purpose of these positions was to deal with customers within the Westar service area with whom Westar had a long-standing relationship; they were not new customers. Specifically these positions were the primary contact for two types of customers: those known as wholesale municipals, which includes partial requirements municipals, full requirements municipals and independent rural electric cooperatives; and the "Top 20" retail accounts, basically Westar's largest commercial accounts. A partial requirements municipal is one that operates its own generating facilities, and many of these have supply contracts with other entities. A full requirements municipal is a customer that purchases its entire supply of electricity from Westar.

The goal for the Manager, Origination position was that it would be the primary contact for the wholesale municipals and retail customers, which would increase profitability by

introducing and marketing to these customers new innovative products patterned after products sold in the wholesale markets.  It was also thought that with a primary contact in place for these organizations, Westar would be able to negotiate better terms on the contracts and establish appropriate pricing.  Prior to 2002, the services and accounts primarily handled by the Manager, Origination positions were handled by the Customer Support Group under Terry Wilson.  The Manager, Origination positions were first created in late 2001.  Plaintiff accepted his position when one manager retired; Tony Delacluyse was eventually placed into the other Manager, Origination position.

    In his role as Manager, Origination, plaintiff was responsible for handling large commercial and industrial or "retail" accounts and wholesale accounts with other utilities, such as cooperatives.  At some point he assumed responsibilities for wholesale municipalities.  By his own account, plaintiff primarily handled the large retail accounts plus other cooperatives, and a smaller portion of the wholesale municipalities, while Delacluyse handled the majority of the wholesale municipalities.  Plaintiff held the title of Manager, Origination, until he left Westar.

### *2002- 2003 Reorganization Decision*

    In February 2002, the Manager, Origination position was modified as to the retail customers—the Customer Support Group would handle the recurring issues for the retail accounts and Generation and Marketing would support these retail accounts as to commodity issues.  The recurring issues included items such as billing; transmission issues such as outage restoration and power quality; and political issues.  The breakdown appeared to work well except when commodity issues arose, which was the primary role to be handled by the Generation and Marketing Group and support function of the Customer Service Group.

In early 2002, Wilson began receiving complaints from several of Westar's municipal customers.  The primary issue was that these customers no longer had a "one-stop shop" to assist them with their issues.  As a result, Wilson wanted to move the primary contact responsibilities back to the Customer Support Group because he believed his group was better suited to handle the issues raised by the municipal customers.  Wilson began keeping notes regarding the issues and/or complaints raised by the municipalities.  In June 2002, Wilson began work on a proposal to help the Generation and Marketing Group serve the wholesale municipal customers with the ultimate goal of returning total responsibility for those customers back to the Customer Support Group.

Wilson prepared a "Weekly Letter" to his supervisor, Randy Degenhardt, summarizing his work.  Included in those letters were Wilson's efforts beginning in June 2002 and continuing into 2003 to work with and convince the Generation and Marketing Group to return the wholesale municipal and cooperative customers to the Customer Support Group.  Degenhardt supported Wilson's determination that these responsibilities should be moved back to the Customer Support Group to better serve the customers.  At the time the reorganization recommendations were made, Westar had lost two accounts due to customer dissatisfaction with the service provided by the Generation and Marketing Group.

In September and October 2002, Olsen, Wilson, Sterbenz and Degenhardt began having conversations about how best to service the wholesale utility and municipal customers.  Because these customer accounts were being serviced by employees on the Generation side of the company, Generation and Marketing was not allowed to deal with transmission issues due to limits imposed by Federal Energy Regulation Commission ("FERC") Standards of Conduct

("SOC") rules.  Highly summarized, FERC SOC Orders 888 and 889 restricted the Generation and Marketing Group from performing certain tasks that Westar considered essential to servicing the municipal, retail and cooperative customer accounts.  Basically, these rules require the transmission function employees to function independently of the retail sales and marketing employees.  Because the majority of the issues raised by these customers were transmission based, management of both Customer Support and Generation and Marketing began to look at ways to transition these responsibilities back to the Customer Support Group.  Accordingly, in September and October 2002, discussions occurred related to transferring the primary job responsibilities held by plaintiff and Delacluyse back to the Customer Support Group.

In October 2002, a joint meeting was held between Degenhardt, Olsen, Sterbenz, Wilson, Gaumer and Tom Stuchlik, Executive Director of Transmission.  At this meeting, it was determined that the issues the municipalities were having could be better served by the Customer Support Group.  As a result of this meeting, the primary contact role for the full requirements wholesale municipalities was moved away from the Generation and Marketing Group and back to the Customer Support Group.  This was done in part because those entities had issues similar to those raised by the retail customers, which had already been moved away from the responsibilities of the Generation and Marketing Group in early 2002.

Meetings regarding the transition of the wholesale cities and cooperatives to the Customer Support Group continued through the end of 2002.  During this time frame, there was some discussion as to whether the combination of the duties in the Customer Support Group would be a violation of the FERC SOC rules.  This issue was raised by plaintiff when he learned of the reorganization.  Eventually, Westar determined that because the Customer Support Group

was not part of the Generation and Marketing Group and would not deal with commodity issues, such an arrangement would not violate the FERC SOC rules.

In January 2003, Sterbenz, Gaumer, Olsen and Wilson conducted a strategy meeting to discuss a business plan for dealing with the wholesale municipals and cooperatives.  At that meeting, the consensus was that the primary contact role should return to the Customer Support Group and they began formulating a plan to do so.  On January 15, 2003, Olsen prepared a memo to Sterbenz that formally documented the plan to shift all primary contact responsibilities back to the Customer Support Group, while the Generation and Marketing Group continued to handle solely commodity issues, specifically contract negotiation and pricing.  The portion of the memo entitled "Background," which outlined the historical handling of the municipal customers by Westar, was authored by Wilson and taken from a document Wilson began working on in June 2002 regarding a proposal to return responsibility for the wholesale customers to the Customer Support Group.  This move was supported by Sterbenz, Caroline Williams, head of the Customer Support Group, and Jim Haines, president of Westar.

This information was not disseminated to lower level employees until April 2003, because the Customer Support Group was undergoing a separate reorganization.  Accordingly, Customer Support asked that the shift of responsibilities not occur until after this process was complete and new teams and responsibilities had been designated department wide.  In April or May 2003, the primary job responsibilities of the Manager, Origination positions were shifted back to the Customer Support Group.  Any remaining responsibilities in the Generation and Marketing Group relating to commodity issues were dispersed to current employees within the Generation and Marketing Group.

Olsen did not realize in January 2003 that, as a result of this reorganization, plaintiff and Delacluyse would no longer have jobs with Westar. Instead, Olsen assumed plaintiff and Delacluyse would move over to the Customer Support Group under Wilson. It was not until closer to the time of the actual transfer that Olsen realized his assumption was incorrect and that Wilson intended to utilize other employees within his group or hire other individuals to handle the job responsibilities.

When the reorganization was discussed, Sterbenz also assumed that plaintiff and Delacluyse would go to work for Wilson in the Customer Support Group. It was not until sometime after the January 15, 2003 Internal Correspondence that he was informed this would not occur and the positions held by plaintiff and Delacluyse would actually be eliminated because Wilson did not intend to utilize them.

Wilson made the decision that the job responsibilities being transferred to the Customer Support Group from the Generation and Marketing Group would be assumed by Wilson and another current employee in his department, Suzanne Eristurk. Ted Furkhen, who works in Human Resources, took care of the paperwork in connection with the elimination of plaintiff's position and considered this a reorganization headed up by Olsen as part of his Generation and Marketing Group. Furkhen was not involved in the reorganization decision and had no knowledge of Wilson's role in that decision.

Neither Olsen nor Sterbenz was involved in the decision by Wilson as to what would happen when the Manager, Origination responsibilities were shifted to the Customer Support Group. Wilson, Degenhardt and Williams, management in the Customer Support Group, did not know plaintiff had filed a KHRC complaint when the reorganization decision was made nor

when plaintiff was not selected for a position in the Customer Support Group.  Wilson was aware of plaintiff's internal grievance to HR, and was interviewed about plaintiff's complaint.  At no time during the discussions between the Generation and Marketing Group and the Customer Support Group was plaintiff or his performance raised as a reason for the reorganization, nor was the effect the reorganization might have on plaintiff's position discussed.

Plaintiff was not involved in the reorganization process, nor did he know who made the decision related to the elimination of his position.  Plaintiff felt like he had a good working relationship with Wilson, never had any problems with him, and does not believe that Wilson retaliated against him.  Plaintiff contends that the job responsibilities at issue never really left the Generation and Marketing Group based upon his belief that Westar was rehiring for this position less than a year later and his reading of a FERC Stipulation Agreement entered into by Westar shortly after his job was eliminated.  The Marketing Alliance Originator position created by Westar was posted in April 2004.  The summary of the job duties reflects this position was responsible for developing new customer relationships throughout the United States, instead of servicing existing customer accounts primarily in Kansas, as in the position held by plaintiff.

The job responsibilities of the Manager, Origination position, excluding the pricing aspect that remained under Olsen's group, were handled by Wilson's Customer Support Group, specifically by Wilson and Eristurk, from April 2003 until approximately February 2005.  The pricing duties for these accounts were supported by a number of people.  Plaintiff and Delacluyse's positions were impacted because they were the primary contacts for these accounts in the Generation and Marketing Group.  Any remaining duties related to commodity issues after the reorganization were dispersed to current employees within the Generation and Marketing

8

Group.

The Stipulation Agreement between Westar and FERC was an agreement that the individuals handling the municipalities, Wilson and Eristurk, would not respond to certain pricing issues.  It was an agreement to segregate the types of questions that could be handled by the Customer Support Group and those that would be handled by the Generation and Marketing Group.

In January 2005, FERC issued a new ruling that held that, as to wholesale customers, the Westar configuration was no longer permissible.  As a result, the job responsibilities at issue were moved back to the Generation and Marketing Group in February 2005.  At that time, Eristurk moved to the Generation and Marketing Group and began reporting to John Olsen. Eristurk kept all of her prior job responsibilities, except retail accounts, which remained with the Customer Support Group.

### *Plaintiff's Job Elimination*

On April 18, 2003, plaintiff and Delacluyse were called into Olsen's office and informed that their positions were being moved.  Plaintiff was informed that Westar had received various complaints from the municipalities as to the quality of service they were being provided.  Olsen informed plaintiff and Delacluyse that their roles would be transferred to Wilson's group.

As a result of the reorganization of his department, plaintiff was given the option to enter the Career Placement Center ("CPC") program, which allowed him to look for another position within the company while continuing to receive the same compensation from Westar.  Plaintiff's other option was to sign a release of any claims against Westar in exchange for a severance payment.  Plaintiff was placed in the CPC effective June 30, 2003, and was eligible to stay in the

program and receive his regular pay until August 6, 2003.  Westar informed plaintiff when he entered the CPC that if he did not find a new position within the company, his employment would be terminated effective August 6, 2003.

Because Wilson's group was performing additional duties assumed from the Generation and Marketing Group, his departmental budget was increased.  He decided to use the additional funds to create two new support positions that were different from the two positions in the Generation and Marketing Group that were eliminated as part of the reorganization.  Plaintiff interviewed for one of the new positions, but was not selected by Wilson.

In May 2003, plaintiff was offered two positions under Olsen in the Generation and Marketing Group.  Plaintiff declined both positions because they would have resulted in a decrease in pay.  As of August 6, 2003, plaintiff had not found another position with Westar, and his employment was terminated.

### Plaintiff's Complaint to HR

Plaintiff complained to Westar's Human Resources department ("HR") on or about March 11, 2002, concerning offensive statements of a sexual nature made by Doug Gaumer. Wilson confirmed the offensive statements made by Gaumer to Shauna Holman-Harries, the HR representative charged with investigating plaintiff's complaint.  Plaintiff wrote a memo to Olsen on October 28, 2002, alleging retaliation by Westar for having made a complaint against Gaumer.  Specifically, plaintiff asserted that he did not receive the bonus share allotment in an amount he felt he was entitled to, in part because of his complaint about Gaumer.  On October 31, 2002, plaintiff was told by Olsen that the company could not trust him because he did not sign a Confidentiality Agreement, and he was suspended, effective immediately.

*Plaintiff's KHRC Complaint*

On or about November 7, 2002, plaintiff filed a complaint of retaliation with the Kansas Human Rights Commission ("KHRC"). Plaintiff specifically complained that in retaliation for filing a grievance with the HR department concerning unwelcome sexual comments from a manager, he was subjected to a reduction in compensation and suspended. This complaint was later cross-filed with the Equal Employment Opportunity Commission ("EEOC").

On January 14, 2003, plaintiff was "written up" by Olsen for alleged insubordination. Specifically, plaintiff told Olsen that he would be "stupid" to fire him because of his pending retaliation allegation. The insubordination memo was later removed from plaintiff's file.

## II.   Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[1] A fact is only material under this standard if a dispute over it would affect the outcome of the suit.[2] An issue is only genuine if it "is such that a reasonable jury could return a verdict for the nonmoving party."[3] The inquiry essentially determines if there is a need for trial, or whether the evidence "is so one-sided that one party must prevail as a matter of law."[4]

The moving party bears the initial burden of providing the court with the basis for the

---

[1] Fed. R. Civ. P. 56(c).

[2] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[3] *Id.*

[4] *Id.* at 251–52.

motion and identifying those portions of the record that show the absence of a genuine issue of material fact.[5]  "A movant that will not bear the burden of persuasion at trial need not negate the nonmovant's claim."[6]  The burden may be met by showing that there is no evidence to support the nonmoving party's case.[7]  If this initial burden is met, the nonmovant must then "go beyond the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[8]  When examining the underlying facts of the case, the Court is cognizant that all inferences must be viewed in the light most favorable to the nonmoving party and that it may not make credibility determinations or weigh the evidence.[9]

## III.    Discussion

Plaintiff claims that Westar retaliated against him in violation of Title VII by terminating his employment.  Plaintiff's retaliation claim is evaluated under the *McDonnell Douglas* burden-shifting framework.[10]  To establish a prima facie case of retaliation, plaintiff must demonstrate (1) that he engaged in protected opposition to discrimination; (2) that a reasonable employee would have found the challenged action materially adverse; and (3) that a causal connection

---

[5]*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[6]*Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp.*, 477 U.S. at 325)).

[7]*Id.*

[8]*Id.*

[9]*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000); *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

[10]*Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1181 (10th Cir. 2006).

existed between the protected activity and the materially adverse action.[11]  Westar admits that

plaintiff has met the first and second elements of his prima facie case.  The Court thus focuses its

discussion on the third element, a causal connection between plaintiff's protected activity and his

termination.

As a threshold matter, however, the Court addresses the nature and scope of plaintiff's

protected activity.  To engage in protected opposition to discrimination, plaintiff must have a

reasonable good faith belief that he was opposing discrimination.[12]  A plaintiff's opposition

could be protected, however, even if he was wrong about whether the alleged conduct in fact

violated Title VII; it is enough if plaintiff had a good faith belief that Title VII had been

violated.[13]  An employer must be aware that the employee has engaged in protected opposition in

order to engage in retaliation.[14]  When adverse employment action is committed in retaliation for

the filing of a charge of discrimination, plaintiff need not file an additional charge.[15]

In the Pretrial Order entered in this case (Doc. 72), plaintiff has only alleged one act or

incident of retaliation—that Westar eliminated his position in retaliation for filing a complaint

with the KHRC in November 2002.  Plaintiff argues that Westar takes a very narrow view of the

scope of his protected activity, which he claims initially occurred as early as March 11, 2002,

when he made a complaint to HR about Gaumer's comments.  While it is true that plaintiff's

---

[11]*Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 126 S. Ct. 2405, 2414-15 (2006)).

[12]*Zinn v. McKune*, 143 F.3d 1353, 1362 (10th Cir. 1998).

[13]*Lombardo v. Potter*, 368 F. Supp. 2d 1178, 1194 (D. Kan. 2005) (citing *Love v. RE/MAX of Am., Inc.*, 738 F.2d 383, 385 (10th Cir. 1984)).

[14]*Id.* (citing *Williams v. Rice*, 983 F.2d 177, 181 (10th Cir. 1993)).

[15]*Seymore v. Shawver & Sons, Inc.*, 111 F.3d 794, 799 (10th Cir. 1997).

grievance may constitute protected activity, the real issue is whether he may rely on such protected activity outside the scope of the Pretrial Order in support of his claim.  Westar argues that plaintiff is limited to establishing his claim based on the protected activity set forth in the Pretrial Order, that is, the filing of his formal complaint with the KHRC, because the parties are bound by the Pretrial Order as to the issues properly before the Court.  Plaintiff argues that the Court must not look solely to the filing of the charge of discrimination with the KHRC, but must look at the entire history of his protected activity, regardless of what was established in the Pretrial Order.

The Court agrees with Westar.  "A plaintiff cannot escape the binding effect of the pretrial order by raising new issues in a response to the defendant's motion for summary judgment."[16]  The pretrial order is the controlling document for trial.[17]  Although the Tenth Circuit has recognized that a pretrial order "should be liberally construed to cover any of the legal or factual theories that might be embraced by its language," it has also found, upon a "careful reading of [that] court's cases reviewing trial courts' construction of pretrial orders," that "a district court may more strictly construe a pretrial order when that order has been refined over time, properly drawn, and drafted with substantial specificity."[18]  Claims not included in the pretrial order are waived.[19]

Here, plaintiff did not include his initial grievance to Westar's HR Department as

---

[16]*Robleado v. Deffenbaugh Indus.*, 136 F. Supp. 2d 1179, 1189 (D. Kan. 2001) (quotation omitted).

[17]Fed. R. Civ. P. 16(a); *Expertise Inc. v. Aetna Fin. Co.*, 810 F.2d 968, 973 (10th Cir. 2002).

[18]*Koch v. Koch Indus.*, 203 F.3d 1202, 1220-21 (10th Cir. 2000) (internal citation omitted).

[19]*Wilson v. Muckala*, 303 F.3d 1207, 1215 (10th Cir. 2002).

protected activity in the Pretrial Order.  Nor did he cite the October 28, 2002 memorandum to

Olsen alleging retaliation because he did not receive adequate bonus shares. Instead, he specified

his protected activity as the filing of the complaint with the KHRC.  Because plaintiff did not

include his initial grievance or subsequent memorandum as protected activity in the Pretrial

Order, the Court will not consider either as a basis for plaintiff's retaliation claim, and will

instead analyze the causation issue in the context of the formal complaint filed with the KHRC

on November 7, 2002.[20]

To establish that a causal connection exists between the filing of charges with the KHRC

and termination of his employment, plaintiff may proffer "evidence of circumstances that justify

an inference of retaliatory motive, such as protected conduct closely followed by adverse

action."[21]  "However, unless the termination is *very closely* connected in time to the protected

activity, the plaintiff must rely on additional evidence beyond temporal proximity to establish

causation."[22]

Plaintiff filed his complaint on November 7, 2002, and received notice that his job would

be eliminated over five months later on April 18, 2003.  In the Tenth Circuit, five months is too

large a time gap to establish a causal connection.[23]  Accordingly, plaintiff must present additional

---

[20]Moreover, plaintiff's claims of retaliation in the form of loss of compensation and suspension related to his grievance are also waived, as his claim of retaliation in the Pretrial Order is specifically limited to termination of employment.

[21]*Proctor v. U.P.S.*, —F.3d—, No. 06-3115, 2007 WL 2705344, at *6 (10th Cir. Sept. 18, 2007) (quotation omitted).

[22]*Piercy v. Maketa*, 480 F.3d 1192, 1198 (10th Cir. 2007) (quoting *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999))(emphasis in the original) (internal citations omitted).

[23]*Id.* (noting that Tenth Circuit has found a proximity of three months insufficient to support "a presumption of causation"); *Proctor*, 2007 WL 2705344, at *6 (finding four months too large a gap).

evidence to establish the necessary causal connection.[24]  Plaintiff proffers in support of causation evidence of Westar's alleged efforts to treat him differently after he filed his grievance with HR, that is, lower compensation and a write-up for insubordination.  However, this alleged retaliatory conduct predated November 7, 2002, the date he filed his Charge.  Plaintiff may not rely on prior acts of alleged discrimination and the Court will not consider this as evidence of causation.[25]

The only alleged retaliatory conduct that occurred after the filing of his Charge was the January 14, 2003 write-up and plaintiff's job elimination.  The write-up was removed from plaintiff's file and did not have any adverse consequences on his employment.  Moreover, the write-up was issued by Olsen; the evidence is that Wilson was the decisionmaker and that there was no nexus between the write-up and plaintiff's termination.  This hardly constitutes a pattern.

The Court agrees with Westar that plaintiff cannot prove a prima facie case that he was discharged in retaliation for filing the Charge with the KHRC.  The decision to reorganize and move plaintiff's job responsibilities back to the Customer Support Group was in process before plaintiff filed administrative charges in November 2002.  Both Manager, Origination positions were subject to the reorganization.  While Wilson was aware of plaintiff's initial grievance filed with HR, there is no evidence that he knew plaintiff had filed the KHRC Charge when he initiated the reorganization or when he made the decision to have the Customer Support Group assume those job responsibilites and not to offer plaintiff one of the open positions in his group.  Similarly, while Olsen may have been aware of plaintiff's KHRC Charge, it is uncontroverted that he was unaware plaintiff and Delacluyse's positions would not be transferred to Wilson as

---

[24]*Piercy*, 480 F.3d  at 1198-99 ("[T]he passage of time does not necessarily bar a plaintiff's retaliation claim if additional evidence establishes the retaliatory motive.").

[25]Nor can plaintiff rely on prior acts of alleged retaliation occurring outside the charging period, as these constitute discrete actions.  *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002).

part of the reorganization.

The other evidence plaintiff proffers in support of causation is evidence he claims demonstrates the weakness of Westar's proffered reason for elimination of his job, thereby creating a genuine issue of material fact as to whether Westar's reason is a pretext for retaliation. Although this kind of evidence is typically considered during the third phase of the *McDonnell Douglas* inquiry, the Tenth Circuit has considered evidence of pretext in the prima facie stage of a retaliation claim.[26]

Westar proffers a reason for plaintiff's termination based on a business decision as to what was best for servicing municipal and retail customer accounts. Westar claims that, due to customer complaints, it was determined that the Customer Support Group was better able to serve the needs of these customers. Plaintiff concedes that Westar's proffered reason is a facially legitimate, nonretaliatory reason, but contends that several pieces of evidence suggest that the reason is "unworthy of belief" and therefore a pretext for retaliation. To establish pretext, plaintiff must present "evidence of such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons."[27]

As evidence of pretext, plaintiff asserts that when he learned about the plan to transfer responsibility for wholesale municipal customers back to the Customer Support Group, he

---

[26]*Proctor*, 2007 WL 2705344, at *6 (citing *Wells v. Colo. Dep't of Transp.*, 325 F.3d 1205, 1218 (10th Cir. 2003) (considering evidence of pretext in analyzing the causation element of a prima facie case of retaliation under Title VII)).

[27]*Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1203 (10th Cir. 2006) (quotations omitted).

informed Wilson and Olsen that he believed this would violate FERC Orders 888 and 889. The

Court questions how this fact, readily admitted by Westar, creates an issue of pretext.  After

considering the issue, it was ultimately determined by Westar that the reassignment of

responsibilities would not violate the FERC orders in place at that time.  The position held by

plaintiff was eliminated and the job responsibilities were assigned to the Customer Support

Group to be performed by Wilson and Eristurk.  These responsibilities were ultimately

reassigned to the Generation and Marketing Group almost two years later, in February 2005, as a

result of a newly issued FERC ruling in January 2005.  Under these circumstances, the fact that

plaintiff's opinion eventually proved true does not establish that he was given a false reason for

the elimination of his position, and is insufficient to support an inference that Westar acted with

retaliatory intent when it eliminated his position in 2003.

Plaintiff also raises questions regarding the identity of the decisionmaker in the

reorganization process.  Westar contends that Wilson, independent of input from Olsen and

without knowledge of the Charge filed by plaintiff, made the decision that plaintiff and

Delacluyse's positions would not transfer over to his Group, forcing plaintiff and Delacluyse into

the CPC program.  Plaintiff cites the deposition testimony of Ted Fuhrken that Fuhrken took care

of the paperwork in connection with the elimination of plaintiff's position and that he considered

the reorganization was Olsen's as part of his Generation and Marketing Group.  Plaintiff

contends that Fuhrken's testimony establishes that it was Olsen, not Wilson, who was

responsible for the decision to eliminate his position.  Fuhrken's testimony, however, merely

states that he viewed plaintiff and Delacluyse's placement into CPC as part of Olsen's

reorganization of his Group, as plaintiff and Delacluyse were employees in Generation and

Marketing, not Customer Service; he specifically testified that he was not involved in the

reorganization decision and had no knowledge of Wilson's role in that decision.  Fuhrken's testimony does not contradict the testimony of Wilson, Olsen and Sterbenz that Wilson made the determination not to bring plaintiff and Delacluyse into his Group or hire them for the newly-created positions in Customer Service.  Thus, Fuhrken's testimony cannot support an inference of pretext.

Moreover, Wilson and Olsen's conduct belies any claim of pretext.  Plaintiff admits that he and Wilson got along well and that he does not believe Wilson retaliated against him.  After plaintiff's position was eliminated and plaintiff was not transferred to Wilson's group and Wilson did not hire plaintiff for an open position, he was offered two positions by Olsen, which he rejected.  While Olsen's write-up of plaintiff in January 2003 may be considered as evidence of pretext, Olsen's offer of two positions within his department seemingly negates any allegation of retaliatory intent.

Plaintiff also argues that he has established pretext as to Westar's position that complaints by the municipalities were the basis for the reorganization.  Plaintiff's contention is based on his  assumption that the complaints were directly attributed to him and were the basis for elimination of plaintiff's position.  Westar has submitted, however, that while some of the complaints were related to plaintiff, the majority were related to issues that could not be adequately addressed by anyone in the Generation and Marketing Group due to FERC SOC rules.  Accordingly, plaintiff's performance was not a basis for the reorganization.

Finally, the Court notes that plaintiff may not rely on his engagement in protected activity or instances of alleged retaliation "well before" the filing of his Charge.  Such activity was not the basis of plaintiff's claim of retaliation as set forth in the Pretrial Order and as such, is irrelevant and inadmissible.  The evidence plaintiff proffers therefore fails to establish the

causation element of a prima facie case.[28]

Even if the Court were to assume that plaintiff has established a prima facie case, the evidence in its totality does not raise a genuine issue of material fact regarding the third step of the *McDonnell Douglas* framework, that is, whether Westar's proffered reason is a pretext for retaliation.[29]  As the above discussion of plaintiff's evidence of pretext demonstrates, he has not created a disputed issue as to whether Westar's proffered reason is "unworthy of belief." Accordingly, the Court grants Westar's motion for summary judgment on plaintiff's claim of retaliation.

**IT IS THEREFORE ORDERED BY THE COURT** that Westar's Motion for Summary Judgment (Doc. 76) is GRANTED.

IT IS SO ORDERED.

Dated this 11th day of October 2007.

 S/ Julie A. Robinson
Julie A. Robinson
United States District Judge

---

[28]*See McGowan v. City of Eufala*, 472 F.3d 736, 747 (10th Cir. 2006) ("If the reason for the claimed adverse action does not flow from a discriminatory motive, it lacks the requisite causal connection to the adverse action.").

[29]*Proctor*, 2007 WL 270534, at *9 (citing *Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1174 (10th Cir. 1998) (noting that the court considers the totality of the plaintiff's circumstantial evidence of pretext); *Stover v. Martinez*, 382 F.3d 1064, 1073-74 (10th Cir. 2004) (assuming plaintiff established a prima facie case but holding she failed to demonstrate a genuine issue of material fact regarding pretext).